IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 12, 2014 Session

## IN RE: ZOEY F.

**Appeal from the Juvenile Court for Hamilton County**
**No. 252441      Robert Philyaw, Judge**

**No. E2013-02603-COA-R3-PT-FILED-MAY 30, 2014**

The Juvenile Court for Hamilton County ("the Juvenile Court") terminated the parental rights of Johonauan J. R. ("Father") to the minor child Zoey F. ("the Child") on the grounds of willful failure to visit, wanton disregard for the welfare of the child, and substantial noncompliance with the statement of responsibilities in the permanency plan. Father appeals the termination of his parental rights. As there is uncertainty regarding the time frame relied upon by the Juvenile Court for the ground of willful failure to visit, we modify the Juvenile Court's judgment to exclude the ground of willful failure to visit. Otherwise, we find and hold that the evidence does not preponderate against the Juvenile Court's finding by clear and convincing evidence that grounds existed to terminate Father's parental rights and that the termination of Father's parental rights was in the Child's best interest. We affirm the termination of Father's parental rights to the Child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed as Modified; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and THOMAS R. FRIERSON, II, J., joined.

David C. Veazey, Chattanooga, Tennessee, for the appellant, Johonauan J. R.

Robert E. Cooper, Jr., Attorney General and Reporter; and, Martha A. Campbell, Deputy Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

## Background

The Child was born in Chattanooga in August 2009. There was some question initially as to the identity of the Child's father. Following the arrest of the Child's mother, the Child was taken into protective custody in June 2010. In October 2010, the Juvenile Court awarded temporary custody of the Child to the Department of Children's Services ("DCS"). In May 2011, the Juvenile Court found the Child dependent and neglected and ordered that DCS retain temporary custody of the Child. The Child's mother's parental rights to the Child, which are not at issue in this appeal, ultimately were terminated. Father continued to resist termination of his parental rights.

Multiple permanency plans were entered with respect to Father. A June 2010 permanency plan required Father, then in jail, to do the following: stay out of trouble; submit to DNA testing; pay child support if ordered; look at programs in jail and provide certificates to DCS; maintain contact with DCS; have a legal verifiable income; maintain safe, stable housing for no less than three months; and, submit to random drug screens and, if he failed any drug screen, complete an A & D assessment. The Juvenile Court ratified the permanency plan in October 2010. An April 2011 permanency plan reflected that Father completed certain courses while incarcerated. The permanency plan reiterated the requirements of the previous permanency plan and required that Father incur no new charges. Father signed the permanency plan in July 2011, and it was ratified later that month. In February 2012, a parental rights termination hearing regarding Father was held. Father's rights were not terminated at that time. A July 2012 permanency plan required Father to arrive on time for visits with the Child and provide DCS with 24 hour notice if he could not attend. Father's attorney signed this permanency plan, and it was ratified in August 2012. An August 2012 permanency plan required Father to, among other things, establish a relationship with the Child. Father's attorney signed this plan on his behalf. In November 2012, DCS filed a petition to terminate Father's parental rights, alleging willful failure to visit, wanton disregard for the welfare of the child, and substantial noncompliance with the statement of responsibilities in a permanency plan. A February 2013 permanency plan containing requirements similar to the earlier plans was ratified in March 2013. This most recent plan contained statements of responsibilities. Trial was held in November 2013.

Father, incarcerated at the time of trial, participated by telephone. Father objected to being absent from court. The Juvenile Court denied Father's request to compel his physical presence. The Juvenile Court stated that everyone indicated they were ready to proceed and noted that Father already had faced a termination hearing before but had received another chance.

Father testified. Father stated that he saw the Child "the moment she was born . . . ." Father did not receive biological confirmation of his paternity to the Child until October 2010. Father testified that he had seen the Child, age four as of trial, around ten times in her life. Father never had physical custody of the Child. Father bristled when asked if he had a relationship with the Child, testifying: "I mean, why did you ask me that question? Of course I've got a relationship with my daughter. I love my daughter." Around four days after the Child's birth in August 2009, Father was "locked up." In November 2011, Father was released and went to a halfway house. In June 2012, Father was arrested on numerous drug-related charges. Father's probation was revoked, and he was incarcerated again. As of the termination hearing, Father awaited trial on the June 2012 charges. Father asserted his innocence on the charges. Regarding visitation, Father stated that DCS arranged visits for him with the Child after the previous termination hearing but he did not receive any bus passes. Father stated that he found out about bus passes in April but was arrested in June 2012 so his opportunity for visits ended. Father testified that he had spoken to the Child by telephone a few times. Father stated that DCS did not provide a good environment for personal interaction on the phone calls.

Father testified as to his compliance with the permanency plans. Father testified: "The permanency plan pretty much consisted of just staying out of trouble and maintaining stable housing and job employment." Father stated that he sometimes worked at Labor Ready when he was out of jail. Father, however, called this an "iffy situation." Regarding suitable housing, Father stated he was working on that. Father testified that he could live with a woman but he knew her only as Lisa. As to having incurred more criminal charges, Father asserted his innocence. Various certificates that Father earned in jail were entered into the record.

Syletta Broadnax ("Broadnax"), the Child's DCS caseworker since July 2012, testified next. According to Broadnax's review of the case records, Father's visitation was uneven at best. Father missed a scheduled visit with the Child in May 2012 and did not inform DCS. Father missed another May visit but left DCS a voicemail explaining that this was on account of an issue with a bus ticket. Father last visited the Child in June 2012. Father appears to have attended two scheduled visits. After Father was incarcerated, Broadnax set up telephone communication between Father and the Child. Phone contact continued until December 2012 when DCS could no longer reach Father. During the last phone call, the Child cried and stated that she did not want to talk on the phone. According to Broadnax, the Child had bonded with the foster family. Broadnax testified that the Child never spoke about Father.

Pamela D. ("Foster Mother") testified. The Child had been in Foster Mother's home since June 2010. The Child calls Foster Mother "mommy" and Foster Mother's

husband "daddy." The Child's biological sibling already is in this foster family. Foster Mother testified that Father twice had sent a card or present to the Child. Otherwise, Father does not keep in touch with or inquire about the Child to Foster Mother. Foster Mother stated that the Child refers to Father simply as Broadnax's "friend." Foster Mother testified that she would like to adopt the Child, whom she described as intelligent and talented.

In December 2013, the Juvenile Court entered its order terminating Father's parental rights to the Child on the grounds of willful failure to visit, wanton disregard for the welfare of the Child, and substantial noncompliance with the statement of responsibilities in the permanency plan. The Juvenile Court also found that it was in the Child's best interest for Father's parental rights to be terminated. Applying the standard of clear and convincing evidence, the Juvenile Court found and held, *inter alia*:

(A)    Respondent [Father] abandoned [the Child] by willfully failing to visit or making only token visitation with said child for four (4) months immediately preceding the filing of this petition, despite knowing that said child was in state custody and despite being free and able to make such visits.

Respondent [Father] was incarcerated part, or all of, the four (4) months prior to the filing of this Petition, and was serving a six (6) year sentence for attempted possession of cocaine for resale. The Respondent initially pled guilty to this charge on July 18, 2002, but the six (6) year sentence was suspended on intensive probation, conditioned upon good behavior. Over the approximately seven (7) intervening years between said guilty plea and the birth of his daughter, [the Child], the Respondent accrued an extensive criminal record, including more drug charges, evasion of police, aggravated assault, unlawful possession of a weapon, theft of property, and criminal trespassing.

Respondent [Father] engaged in criminal conduct that exhibits wanton disregard for the child's welfare, prior to his incarceration, on or around August 29, 2009. At the time of the Respondent's arrest in August of 2009, for possession of cocaine, methamphetamine, marijuana and drug paraphernalia, he was already on intensive probation for conviction on nearly identical charges in July of 2002, and had also been convicted of theft, criminal trespassing, evasion of police, aggravated assault, possession of cocaine for resale, and unlawful possession of a weapon. In spite of knowing that he was already on intensive probation for his extensive criminal history, Respondent continued to engage in criminal acts which violated his probation.

-4-

Due to the probation violation and the new crimes he committed, he has been incarcerated for practically all of the subject child's life.

[Father] left the Tennessee Department of Corrections and admitted to a half-way house/group home in Nashville, TN in June of 2012. On June 28, 2012, Respondent [Father] was arrested for several charges in Davidson County: unlawful possession of a weapon (felon in possession of a handgun); synthetic marijuana violation; unlawful possession of a controlled substance; 2 counts of a violating [sic] the drug-free school zone (1,000 feet within a school building); and felony drug offense. He was sent back to the West Tennessee State Penitentiary prison and then released on December 30, 2012. He was then transported to the Davidson County, TN Criminal Justice Center to face the charges from June 2012. Respondent [Father] has remained incarcerated at the Criminal Justice Center since December 30, 2012.

(B) Respondent, [Father], has failed to comply in a substantial manner with the statement of responsibilities set out in periodic foster care plans prepared for said Respondent, following the subject child being found to be dependent and neglected by the Juvenile Court of Hamilton County. Children's Services has explained to Respondent those reasonable responsibilities, which are directly related and aimed at remedying the conditions, which necessitate foster care placement. Specifically, Respondent [Father] failed to: maintain a safe and stable residence; provide proof of a legal, verifiable source of income; refrain from illegal activities; do not incur any more legal charges; participate in random drug screens and provide proof that he no longer uses drugs; and pay child support as ordered by the court. [Father] has not only failed to complete his responsibilities on his permanency plan, but did not complete even one of the responsibilities.

4. Pursuant to T.C.A. § 36-1-113(i), it is for the best interest of the subject child and the public that all of the parental rights of Respondent, [Father], to [the Child], be forever terminated and that the custody, control and complete guardianship of said child should now be awarded to the State of Tennessee, Department of Children's Services with the right to place said child for adoption and to consent to any adoption *in loco parentis*, in that

(a) Respondent, [Father], failed to make any adjustment of circumstance, conduct or conditions to make it safe and in the child's best interest to be placed in the care of said Respondent.

(b)     Respondent, [Father], failed to make a lasting correction of their circumstances [sic] after the state has tried to help him, and it doesn't appear that lasting change is likely.

(c)     Respondent has not maintained regular visitation or other contact with the child.

(d)     There is no meaningful relationship between the Respondent [Father] and [the Child].  The Respondent has been incarcerated for most of the child's life, and therefore, cannot form a meaningful relationship with the child.

(e)     A change of caretakers and home is likely to have a highly negative effect on the child. [The Child] was placed in her current foster home on June 9, 2010 and has thrived in this placement.

(f)     The physical environment of the Respondent's home is unhealthy and unsafe due to criminal activity or the use of alcohol or controlled substances, which renders the Respondent consistently unable to care for the child in a safe and stable manner.  This is plainly evident by the pattern of illegal activities that the Respondent has engaged in.

(g)     Continuation of the legal parent and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home.  The likelihood that a successful adoptive placement can be found for any child in foster care diminishes as the child grows older and as the amount of time spent in foster care lengthens.

Father appeals the termination of his parental rights.

### Discussion

Although not stated exactly as such, Father raises three issues on appeal: 1) whether the Juvenile Court erred in finding clear and convincing evidence for the ground of abandonment; 2) whether the Juvenile Court erred in finding clear and convincing evidence for the ground of substantial noncompliance with the statement of responsibilities in the permanency plan; and, 3) whether the Juvenile Court abused its discretion by not requiring Father to be physically present at the final hearing rather than attend by telephone.  Although Father does not raise the issue of whether the termination of his parental rights to the Child was in the Child's best interest, we will address that issue as well.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear

and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

In pertinent part, Tenn. Code Ann. § 36-1-113(g) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4; . . . .

Tenn. Code Ann. § 36-1-113(g) (Supp. 2013). As pertinent to this issue, Tenn. Code Ann. § 36-1-102 provides:

(1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

* * *

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2010).

We first address whether the Juvenile Court abused its discretion by not requiring Father to be physically present at the final hearing rather than attend by telephone. Tenn. Code Ann. §36-1-113(f)(3) (Supp. 2013) provides:

> That the incarcerated parent or guardian has the right to participate in the hearing and contest the allegation that the rights of the incarcerated parent or guardian should be terminated, and, at the discretion of the court, such participation may be achieved through personal appearance, teleconference, telecommunication or other means deemed by the court to be appropriate under the circumstances; . . . .

We recently addressed the issue of a parent's participation at a parental rights termination case in *In re S. H.*, No. E2013-02007-COA-R3-PT, 2014 WL 1713769 (Tenn. Ct. App. Apr. 29, 2014), *perm. app. pending*. This Court stated:

> In the context of a parental termination hearing, this Court has observed that "due process requires the trial court to provide the prisoner defendant with meaningful access to the court and an opportunity to be heard." *In re Tiphani H.*, No. E2010-02112-COA-R3-PT, 2011 WL 4597551 at *6 (Tenn. Ct. App. E.S., filed Oct. 6, 2011)(quoting *In re Perry*, No. W2000-00209-COA-R3-CV, 2001 WL 277988 at *5 (Tenn. Ct. App. W.S., filed Mar. 12, 2001)). "Incarcerated parents, however, 'have no absolute right to be in attendance at the hearing of a civil matter.' " *Id*. (quoting *State v. Moss*, No. 01A01-9708-JV-00424, 1998 WL 122716 at *5 (Tenn. Ct. App. M.S., filed Mar. 20, 1998)). "[T]he decision to permit a prisoner to physically appear in court to defend a civil proceeding is within the sound discretion of the trial court." *Id*. (citing *Moss*, at *4).

> In the present case, Mother has failed to demonstrate that due process was not afforded her, either by requiring her to participate in the termination hearing by telephone or in the manner in which such hearing was conducted. Our review of the record leads us to reject Mother's bald assertion that she was denied her "full due process rights" as a result of the court's refusal to delay the hearing so that she could appear in person at some later date. "To clarify, an incarcerated parent has the right to 'participate' in a termination hearing. An incarcerated parent does not, however, have an absolute right to 'appear' at a termination hearing." *Id*. Given Mother's decision to waive extradition days before she was set to appear in court, the court took the only logical alternative that would allow Mother's rights to be preserved while also working to achieve permanency for the Children without further delay.

Mother has failed to establish that she was unable to fully participate in the termination hearing or that she was in any way prejudiced in participating by telephone rather than in person. Accordingly, we conclude that the trial court did not abuse its discretion in denying Mother's motion for a continuance.

*In re S. H.*, 2014 WL 1713769, at **5-6.

In the instant case, Father made several frank interjections during the trial and generally had his say. For example, Father volunteered that he believed the Juvenile Court held ill feelings toward him, which the Juvenile Court denied. At another point, Father chimed in during Broadnax's testimony. At oral arguments on appeal, Father argued that these interjections perhaps were not helpful to his case and that they might not have occurred had Father been physically present at trial so as to be able to converse quietly with his attorney. This may be, but how Father might have behaved at trial in person fundamentally is pure speculation. Perhaps Father would have been even more disruptive. If Father wanted to participate in the trial in a more effective way he could have asked to speak to his attorney privately when necessary. Father also might have just restrained himself. Even if one accepted Father's reasoning, there is no evidence that Father actually was prejudiced by participating at trial by telephone. None of Father's interjections over the phone appear to have been decisive to the outcome of the trial. The Juvenile Court did not err in declining to require Father to physically appear at the trial.

We next address whether the Juvenile Court erred in finding clear and convincing evidence for the ground of abandonment. The Juvenile Court found two distinct grounds regarding abandonment: willful failure to visit and wanton disregard for the welfare of the child. We address the former first.

Father argues that the Juvenile Court erred in not making a specific finding that Father failed to visit the Child during the four months preceding his incarceration as required by statute. Indeed, the Juvenile Court in its order refers to the four months preceding the filing of the petition at one point only to later find that Father was incarcerated for all or part of the four month period preceding the filing of the petition to terminate parental rights. At oral argument, DCS appeared to acknowledge this discrepancy and focused on wanton disregard for the welfare of the child as an abandonment ground. Given the ambiguity, and in light of the high bar set in cases where parental rights are at stake, we modify the judgment of the Juvenile Court to exclude the ground of willful failure to visit.

The Juvenile Court, however, also found that the ground of wanton disregard for the welfare of the child was proven by clear and convincing evidence. The Juvenile

Court anchored its finding here primarily in two episodes. First, when the Child was 5 days old on August 29, 2009, Father was arrested on drug charges. Father argues that at that stage, he was not certain that he was the Child's father and therefore this incident cannot form part of a basis for wanton disregard. However, Father testified "I seen her the moment she was born . . . I got locked up, like, four days after she was born because I was on the run." Father stated: "I had a feeling that she was mine . . . ." While Father did not learn conclusively that he was the Child's father for another year, he certainly had more than an inkling that he might well be the Child's father. We hold that the August 2009 incident may properly be considered for the purposes of the ground of wanton disregard. Second, the Juvenile Court referred to multiple charges that Father incurred in June 2012. Father argues that the presumption of innocence should prevail to remove these charges from consideration as Father had not yet been tried on the charges. This Court stated in *In re: Audrey S.*: "We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re: Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005). We do not look at the June 2012 charges in isolation. They represent only part of Father's troubled background.

We find and hold that the totality of Father's reckless and criminal behavior before his most recent incarceration, including the August 2009 incident and incurring subsequent additional criminal charges, constitutes wanton disregard for the welfare of the Child. The evidence in the record on appeal does not preponderate against the Juvenile Court's findings made by clear and convincing evidence that grounds were proven to terminate Father's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(iv) for abandonment by wanton disregard.

We next address whether the Juvenile Court erred in finding clear and convincing evidence for the ground of substantial noncompliance with the statement of responsibilities in the permanency plan. Father asserts on appeal that none of the permanency plans in the record of this case contain a statement of responsibilities. Therefore, according to Father, he cannot be penalized for not adhering to responsibilities in a statement which does not exist. Father relies on the case of *In re Abigail F. K.*, where this Court stated:

> If the parent is required to comply with the permanency plan, then the permanency plan should clearly communicate to the parent: this is what you must do to regain custody of your child. That is the purpose of the parent's statement of responsibilities. Thus, the absence of a clearly marked "statement of responsibilities" for Mother in the permanency plan is a significant problem.

-11-

It is difficult for the Court to find that Mother failed to substantially comply with the plan's statement of responsibilities if the plan does not contain one.

*In re Abigail F. K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at *13 (Tenn. Ct. App. Sept. 14, 2012), *no appl. perm. appeal filed.*

However, we then went on to state: "We note that there is no dispute on appeal about what most of Mother's responsibilities were under the plan, with the exception of DCS's request that Mother find a residence other than her mother's home. Consequently, in the alternative, we will consider the evidence on this ground for termination." *In re Abigail F. K.*, 2012 WL 4038526, at *13 (footnote omitted).

First, it is not at all clear that Father's factual contention here is correct. The most recent permanency plan in the record does have goals included under headings of "statement of responsibilities." We are aware that Father was incarcerated when that permanency plan was created. Indeed, Father has been incarcerated for most of the Child's life. Naturally, this tends to make it more difficult for Father to meet his responsibilities. On the other hand, Father's own choices have led to his predicament. Father, however, has not been incarcerated for the entire life of the Child. Father was free from November 2011 through June 2012. Father had, if not a fresh start, at least a greater opportunity to adhere to his responsibilities under the plans. Father failed to take advantage of this opportunity.

The absence of a more detailed statement of responsibilities in a permanency plan, while regrettable, is not necessarily fatal to reviewing a finding of substantial noncompliance with the statement of responsibilities in a permanency plan. As set out more fully above, Father testified to what he was required to achieve under the permanency plans. Father understood his responsibilities, including: provide a home for the Child, provide a source of legal and verifiable income, and avoid additional charges. We also find that these responsibilities, relevant as they were to Father's continual instability, reasonably relate to reunification. The record shows that Father participated in the process along the way as the multiple permanency plans cropped up in this case. Father was not ignorant about what was expected of him. Nevertheless, Father failed to avoid new criminal charges, failed to hold down a job with legal income, and failed to provide a stable home for the Child. We find that the Juvenile Court's findings made under the clear and convincing standard as relevant to the issue of substantial noncompliance with the statement of responsibilities in the permanency plan are supported by a preponderance of the evidence. The Juvenile Court did not err in finding and holding that clear and convincing evidence existed that grounds were proven to terminate Father's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(2).

The final issue we address is whether the termination of Father's parental rights was in the Child's best interest. Tenn. Code Ann. § 36-1-113(i) provides:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2013).

The Juvenile Court conducted a detailed best interest analysis and concluded that it was in the Child's best interest for Father's parental rights to be terminated. According to the evidence in the record on appeal, the Child is thriving in a foster family. On the other hand, the Child has no meaningful relationship with Father, and there is no realistic prospect that Father can parent the Child any time soon. The evidence is at least clear and convincing that it is in the Child's best interest for Father's parental rights to be terminated. We find no error in the Juvenile Court's determination that clear and convincing evidence was proven that it was in the Child's best interest for Father's parental rights to be terminated.

We modify the judgment of the Juvenile Court to exclude the ground of willful failure to visit. As other grounds to terminate Father's parental rights were proven by clear and convincing evidence, and it was proven by clear and convincing evidence that the termination of Father's parental rights was in the Child's best interest, we affirm the Juvenile Court's judgment terminating Father's parental rights to the Child.

### Conclusion

The judgment of the Juvenile Court is affirmed as modified, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Johonauan J. R., and his surety, if any.

_____
D. MICHAEL SWINEY, JUDGE

-14-